# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 27, 2011

## STATE OF TENNESSEE v. JEREMY CURTIS WORKMAN

**Criminal Court for Greene County**
**No. 09CR111     Judge John F. Dugger, Jr.**

---

**No. E2010-02278-CCA-R3-CD - Filed December 13, 2011**

---

A Greene County jury convicted the Defendant, Jeremy Curtis Workman, of five counts of rape of a child and two counts of incest. The trial court sentenced the Defendant to twenty-five years confinement for each rape of a child conviction and six years for each incest conviction and ordered that the rape of a child sentences run concurrently to each other but consecutively to each incest conviction, for a total effective sentence of thirty-seven years to be served in the Tennessee Department of Correction. On appeal, the Defendant contends: (1) the trial court erred when it denied his motion to suppress his statements; (2) the trial court erred when it denied his motion to sever the offenses; (3) the trial court erred when it denied his motion for a judgment of acquittal based on the prosecutor's failure to establish jurisdiction or proper venue of the trial court; (4) the trial court erred when it overruled his motion to exclude members of the clergy from testifying at trial; (5) there is insufficient evidence to support the jury's findings; (6) the trial court erred when it denied his motion for mistrial based on improper, prejudicial testimony from a DCS investigator; and (7) the trial court erred when it denied his motion for new trial based on the prosecutor's improper comments to the jury. After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, J.J., joined.

Duncan Cates Cave, Greeneville, Tennessee for the Appellant, Jeremy Curtis Workman.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; C. Berkeley Bell, District Attorney General; Cecil Mills and Tara Trent, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's sexual encounters with the victim, who was his stepdaughter and who was between the ages of twelve and fourteen at the time of the encounters. For these encounters, a Green County grand jury indicted the Defendant for five counts of rape of a child and three counts of incest. Before trial, upon motion of the State, the trial court dismissed one of the counts of incest.

### A. Pretrial Proceedings

The Defendant sought to suppress an oral statement he made to investigators, contending that the statement was involuntarily because he received no *Miranda* warnings. The trial court held a hearing on the motion, wherein the State called Jim Ellison, a detective lieutenant with the Greene County Sheriff's Department, to testify. Lieutenant Ellison testified that he was present at the Department of Children's Services ("DCS") Office on December 12, 2008, when DCS interviewed the Defendant. Lieutenant Ellison testified that he did not conduct the interview, but he was present for it and introduced himself to the Defendant. Lieutenant Ellison explained that DCS investigators conducted the interview, and investigators informed the Defendant that he was free to leave the interview at any time. No detective placed the Defendant under arrest, and he left the DCS Office on his own. Authorities did not arrest the Defendant until three months later on March 19, 2009.

Lieutenant Ellison testified that the Defendant told DCS case manager Jeremy Hall that he understood that he had been asked to give an interview "about touching [the victim]." Ellison testified that the Defendant admitted that he first molested the victim in May 2008. The Defendant also admitted that he "had sexual intercourse with [the victim]," "he penetrated [the victim] with his penis," and admitted "mutual oral sex [and] digital penetration" with the victim. According to Lieutenant Ellison, during the interview, the Defendant stated that the molestation took place in his bedroom while his wife, the victim's mother, was at work. The Defendant also stated that the victim would stay home from school on occasions to have sexual relations with the Defendant. The Defendant further admitted that the first genital penetration took place in May 2008, the second in July 2008, and a third in August 2008. Lieutenant Ellison testified that, during the DCS interview, the Defendant admitted that "all three times there was mutual oral sex, digital and genital penetration and also fondling of her breasts and vagina." The Defendant stated that he never used protection, and, instead, pulled out and ejaculated onto a towel. Lieutenant Ellison testified that he did not read the Defendant *Miranda* warnings, and he did not wear a weapon during the

interview. Lieutenant Ellison further testified that the Defendant agreed to come review and sign a copy of the statement containing the confession, but the Defendant subsequently refused to meet with him.

Susan Barnes, a DCS investigator, testified that she attended, and took notes during, the Defendant's interview at the DCS office. Barnes did not question the Defendant during the interview, but the Defendant was questioned by Jeremy Hall, a staff member with DCS, who worked in Georgia at the time of the hearing. Barnes's notes reflected that the Defendant admitted he had sexual intercourse with the victim in May, July, and August of 2008. Barnes testified that the Defendant admitted to genital penetration, digital genital penetration, mutual oral sex, and mutual masturbation of the victim.

Before denying the Defendant's motion to suppress, the trial court made several findings of fact. The trial court found that the investigators informed the Defendant that he could leave and knew he was not under arrest. The trial court found that the Defendant proffered no evidence of the length of the questioning nor any evidence to show physical abuse or threats of abuse. Further, none of the detectives wore weapons during the questioning. The court found that the interviewers told the Defendant about the subject matter of the interview and that the Defendant confessed at that time to the sexual contact with the victim. After reviewing the totality of the circumstances, the trial court determined that the Defendant was not in custody, and he voluntarily gave his statement to the investigators. The trial court subsequently denied the Defendant's motion to suppress his statements.

Next, the Defendant argued his motion to sever the offenses, all of which involved sexual offenses against the same victim within the period of time beginning in October 2006 and ending in December 2008. The trial court took the argument under advisement but later denied the motion. The trial court determined that all of the charged offenses involved sexual penetration of the same victim by the Defendant at the same residence. Therefore, because the offenses involved the same conduct, the same victim, and the same location, the trial court found that mandatory joinder was appropriate.

The Defendant then argued that his case necessitated a change of venue. The Defendant requested a change of venue because the case had appeared in the local newspaper, the *Greeneville Sun*. The Defendant argued that the articles written about the case caused undue excitement and prejudice to him. The trial court denied the motion for change of venue because the Defendant failed to file an affidavit that alleged facts constituting undue excitement, and a "motion for change of venue will only be granted upon proof by preponderance of the evidence that a fair trial cannot be conducted without a change of venue."

Lastly, the Defendant argued a motion to exclude the proposed testimony for the State of two members of the clergy, who planned to testify that the Defendant admitted to his sexual relationship with the victim. The Defendant contended that the testimony from the two members of the clergy was a violation of the Defendant's clergy-penitent privilege. The trial court denied the motion to exclude the testimony as a violation of the clergy-penitent privilege because an exception to the privilege exists for child sexual abuse cases. The trial court stated, except for the attorney-client privilege, Tennessee law "contains a sweeping exception to the testimony of privileges in child sexual abuse cases. Except in the case of attorney[-]client privilege, no confidential communication otherwise protected . . . is privileged in any situation involving known or suspected child abuse, child sexual abuse."

## B. Trial

At trial, the State called both of the investigators who testified in the pretrial hearings: Susan Barnes, a DCS investigator; and Jim Ellison, a detective lieutenant with the Greene County Sheriff's Department. Barnes testified that she responded to a complaint made to a sexual abuse hotline in Nashville, and she spoke with the victim at Nolichuckey Elementary School about the occurrences. She testified that she asked the victim's mother and the Defendant to come to the DCS Office in Greeneville. She testified that she and Lieutenant Ellison were present for the December 12, 2008 interview with the Defendant.

Barnes stated the same facts that she explained during her testimony at the pretrial hearing. She testified that the Defendant acknowledged sexual activity with the victim at least twice a month from May 2008 until August 2008, and he admitted that "about five months [earlier] her had touched the child inappropriately." The Defendant admitted to having sexual intercourse and oral sex with the victim. Barnes testified that the Defendant stated that his wife, the victim's mother, had knowledge that he "messed around" with the victim, but he claimed that she was unaware that he had sexual intercourse with the victim. The Defendant stated that his "other children would be upstairs in their room or playing when that happened." Barnes testified that the Defendant admitted to being the "aggressor" in the encounters, which included genital penetration, digital penetration, and oral sex. The Defendant acknowledged that this took place "more than once." Barnes testified that the Defendant stated that "he would never do anything with the child as far as anal sex but that he would put his penis in her or would finger her." During the interview, the Defendant stated that he could not touch "his own children" like that, but he would touch the victim, who was his stepdaughter, in those ways. The Defendant admitted that "he first felt bad but then the more it happened the more he enjoyed it."

Barnes stated on cross-examination that the Defendant did not admit to any penetration of the victim before her fourteenth birthday on October 4, 2008. Barnes also

4

testified on cross that the victim reported sexual penetration by the Defendant prior to her thirteenth birthday, at which time defense counsel asked Barnes if "[t]hat was a complete statement of what [the victim] stated to [Barnes]." Barnes testified that "[the victim] told [Barnes] that things had been going on with her since she was five." The Defendant made a motion for mistrial at that time, based on Barnes's testimony of prior sexual conduct that occurred before the indictment period. The trial court denied the motion, and it gave a curative instruction to the jury.

Lieutenant Ellison testified that he sat in on the December 12, 2008 interview with the Defendant at the DCS office in Greeneville. Lieutenant Ellison also testified that the Defendant admitted to having sexual intercourse with the victim from May 2008 until December 2008, and that the intercourse included oral sex and digital penetration. Lieutenant Ellison testified that the Defendant stated he had sexual intercourse with the victim an average of twice a month during that time period. Lieutenant Ellison further testified that, after the interview, he asked the Defendant to stop by the police department on the following Monday to read and review the statement. The Defendant then left the DCS Office. On that following Monday, the Defendant told Lieutenant Ellison that he would not come to the police department to speak with him.

The victim, A.F.,[1] was fifteen years old at the time of trial. She testified that she was born on October 4, 1994. She explained that the Defendant had been her stepfather for "about ten years." The victim testified that on December 12, 2008, she told the school bus driver that the Defendant sexually abused her. The victim explained that she told the bus driver because "[a] couple of days before [she] told about everything that was going on, [the Defendant] was sexually abusing [her] and [she] got tired of it." She testified that all of the rapes occurred at her home in Greene County, specifically in the bedroom used by her mother and the Defendant.

The victim testified that the first incident of sexual abuse took place in October 2006, which occurred soon after the victim moved to a new school in Greene County. The victim "got off the bus from school . . . and [she] walked in the house and then [the Defendant] talked [her] into going into [his] bedroom and he shut and locked the door behind [them] and then he took [her] clothes off and his clothes off and then he stuck his penis in [her] vagina." She testified that her brothers and sisters were "upstairs cleaning" at the time. She also testified that she turned twelve years old on October 4, 2006.

---

[1] It is the policy of this Court to refer to juvenile victims of sexual assault by their initials only.

The victim testified that a second incident occurred in December 2006. The victim recalled it was around Christmas because she was on a school break. The Defendant told the victim to go to his bedroom shortly after she woke up. He shut and locked the door and "started taking [her] clothes off and then stuck his hands in [her] vagina and fingered [her]."

The victim testified that another rape occurred around the time of her sister's February 13, 2007 birthday. The Defendant again took the victim into his bedroom and "stuck his penis in [her] vagina." The victim testified that she was "upset and mad[,]" but the Defendant threatened to hit her if she told anyone.

The victim testified to an additional rape, which took place on her brother's birthday, July 22, 2007. After her brother's birthday party, the Defendant took the victim into his bedroom and locked the door. The victim testified that the Defendant "started taking both of our clothes off and stuck his penis in [her] vagina." The victim recalled that her mother was cleaning the carport and on the computer during the rape.

The victim testified that another rape took place in August 2007, after the family had gone shopping for school supplies at Wal-Mart. The Defendant "talked [the victim] into [the bedroom]" by asking her to help him clean the bedroom. The victim testified that "[he] shut the door and locked it behind us and then he started taking both of our clothes off . . . and then stuck his penis in [her] vagina."

An additional rape took place around the end of the school year in May 2008. The victim testified that, after school that day, the Defendant entered her bedroom and told her to go to his bedroom where he again "took both of [their] clothes off and then stuck his penis in [her] vagina." The victim testified to digital penetration and oral sex in addition to the penile penetration on this occasion. After this rape, the victim testified that she informed her mother of the Defendant's actions. The victim's mother asked the Defendant whether the victim's allegations were true, and he "nodded his head and said, yes, that was true." The victim's mother then kicked the Defendant out of the house.

Before the final instance of rape occurred in December 2008, the Defendant had returned to live in the victim's home. The victim testified that the Defendant talked her into the bedroom, where he closed and locked the door. He then took her clothes off and his clothes off, and "he stuck his penis in [her] vagina." This rape prompted the victim to tell a non-family member, her school bus driver, about the abuse. The victim testified that she did not ask to be penetrated by the Defendant, and she usually left the bedroom "crying."

Dr. Peter Reardon, an obstetrician-gynecologist, examined the victim on January 2, 2009. He conducted a normal female gynecological exam, "and her genital examination

6

indicated that she was not a virgin." Dr. Reardon testified that the examination gave him the opinion that the victim had been having regular sexual intercourse. He could not state within a reasonable degree of medical certainty how long the victim had been having sexual intercourse or with whom she had been sexually active. He also testified that her hymen presented a scar, which indicated that an object had torn her hymen in the past.

Tracy Jones, pastor at Appalachian Baptist Church, testified that, in 2008, the Defendant told Jones that he had an inappropriate relationship with the victim. The Defendant explained to Jones that he had sexual intercourse with the victim, and the victim had reported his actions to the authorities. Jones testified that the Defendant did not share specific dates on which the Defendant had sexual intercourse with the victim. Jones further testified that he later told the church congregation and another pastor, Pastor David Fox, about the Defendant's admission.

David Fox, pastor at the Eastside Baptist Church, testified that the Defendant "showed up one Sunday morning" in 2008. Fox testified that the Defendant attended another church at the time, but the Defendant came by himself to Fox's church that Sunday. Fox testified that the Defendant told Fox that he needed to speak with him, and the Defendant returned to the church office later in the week. The Defendant told Fox that he "had had a sexual relationship with [the victim]" and "that they had [a] sexual relationship for about a three month period" in 2008. Fox testified that the Defendant admitted that he "did the wrong thing" and deserved to go to jail. Fox further testified that he did not report the conversation to authorities because he knew it had already been reported.

At the end of the State's proof, the Defendant moved for a judgment of acquittal, arguing that the State had not met its burden of proving the case. The trial court denied the motion because "[c]onsidering the evidence in the best light for the State of Tennessee, a rationale trier of fact could conclude that the [D]efendant committed the offenses as charged."

Based upon the evidence, the jury convicted the Defendant of five counts of rape of a child and two counts of incest. The trial court sentenced the Defendant to twenty-five years for each rape of a child conviction and six years for each incest conviction. The trial court ordered the Defendant to serve the five rape of a child sentences concurrently with one another, but it imposed consecutive sentencing for each of the two six-year incest convictions, for a total effective sentence of thirty-seven years.

## II. Analysis

On appeal, the Defendant presents the following issues: (1) the trial court erred when

it denied his motion to suppress his statements; (2) the trial court erred when it denied his motion to sever the offenses; (3) the trial court erred when it denied his motion for a judgment of acquittal based on the prosecutor's failure to establish jurisdiction or proper venue of the trial court; (4) the trial court erred when it overruled his motion to exclude members of the clergy from testifying at trial; (5) there is insufficient evidence to support the jury's findings; (6) the trial court erred when it denied his motion for mistrial based on improper, prejudicial testimony from a DCS investigator; and (7) the trial court erred when it denied his motion for new trial based on the prosecutor's improper comments to the jury.

## A. Motion to Suppress

The Defendant argues that the trial court erred in denying the Defendant's motion to suppress statements he made to investigators because the questioning constituted a custodial interrogation, and he had not received *Miranda* warnings. The statements at issue are those the Defendant gave during his interview with DCS Investigators Barnes and Hall and Greene County Sheriff's Lieutenant Ellison. During that interview, the interviewers told the Defendant the subject matter of the interview, and the Defendant confessed to the sexual relationship with the victim.

The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23; *see State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W .2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. *Odom*, 928 S.W.2d at 22-23; *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give

evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). "Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible." *State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (citing *Rogers v. Richmond*, 365 U.S. 534, 540 (1961)). In order to make the determination of whether a confession was voluntary, the particular circumstances of each case must be examined. *Id*. at 377 (citing *Monts v. State*, 400 S.W.2d 722, 733 (1966)). "Coercive police activity is a necessary prerequisite in order to find a confession involuntary." *Id*. (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). "The crucial question is whether the behavior of the state's officials was 'such as to overbear [defendant]'s will to resist and bring about confessions not freely self-determined.'" *Id*. (quoting *Rogers*, 365 U.S. at 544); *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). The question must be answered with "complete disregard" of whether the defendant was truthful in the statement. *Phillips*, 30 S.W.3d at 377 (citing *Rogers*, 365 U.S. at 544).

In this case, the Defendant arrived at the DCS office voluntarily, he was not under arrest, and he agreed to speak with investigators. The investigators informed the Defendant that he could leave at any time. Further, Ellison did not conduct the interview, he merely observed DCS investigators, and Ellison had no weapons on his person during the interview. The interviewers told the Defendant the subject matter of the interview, and, at that time, the Defendant admitted to sexual contact with the victim. After reviewing the totality of the circumstances, the trial court determined that the Defendant was not in custody, and he voluntarily gave his statement to the investigators. We agree with the trial court. After thoroughly reviewing the record, we conclude that the trial court properly determined that the Defendant was not in custody prior to voluntarily giving his statements to the DCS investigators. The Defendant is not entitled to relief on this issue.

**B. Severance**

9

The Defendant argues that the trial court erred when it consolidated the offenses for trial and when it denied his motion for severance. Because the offenses involved the same conduct, the same victim, and the same location, the trial court found that mandatory joinder was appropriate.

A trial court shall grant a pretrial motion to sever if it is "deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A). Decisions concerning consolidation and severance of offenses pursuant to Rules of Criminal Procedure 8(b), 13, and 14(b)(1) will be reviewed for an abuse of discretion. *State v. Denton*, 149 S.W.3d 1, 12 (Tenn. 2004); *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn. 2003). An abuse of discretion in this context implies that the trial court applied an incorrect legal standard or reached a decision against logic or reasoning which caused an injustice to the complaining party. *Spicer v. State*, 12 S.W.3d 438, 443 (Tenn. 2000); *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Rule 8(b) of the Tennessee Rules of Criminal Procedure, which allows for the permissive joinder of offenses, states: "Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character." Tenn. R. Crim. P. 8(b). Rule 13(a) provides as follows: "The court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8." Tenn. R. Crim. P. 13(a). Nonetheless, Rule 14 of the Tennessee Rules of Criminal Procedure states that "[i]f two or more offenses have been joined or consolidated for trial . . . the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1). To avoid severance, both portions of the rule must be satisfied. *See State v. Hallock*, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993).

The first prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires that the trial court find a common scheme or plan. In Tennessee, there are three categories of common scheme or plan evidence: (1) evidence showing a distinctive design or signature crime; (2) evidence demonstrating a larger, continuing plan or conspiracy; and (3) evidence that the offenses are part of the same transaction. *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999).

The second prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure is what the Tennessee Supreme Court has deemed the "primary inquiry" in any severance case,

and is whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed. *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984). Our Supreme Court has stated that "'[u]nless [it is] expressly tied to a relevant issue, evidence of a common scheme or plan can only serve to encourage the jury to conclude that since the defendant committed the other crime, he also committed the crime charged.'" *Moore*, 6 S.W.3d at 239 n.5 (quoting *Hallock*, 875 S.W.2d at 292).

In this case, all indictments included the same type of conduct, and all of the offenses took place under similar circumstances: in the Defendant's bedroom at the house in which both the Defendant and the victim resided. The trial court determined that the evidence showed an ongoing pattern of similar crimes against the same victim, and the trial court further determined that the evidence of each offense would have been admissible in a separate trial for the other offenses. We conclude that the trial court did abuse its discretion by denying the Defendant's motion for severance. The Defendant is not entitled to relief on this issue.

## C. Venue

The Defendant argues that the trial court improperly denied his motion for judgment of acquittal on all counts because the State provided no proof "showing that jurisdiction and venue [were] proper as a matter of law in relation to all counts."

Our Constitution provides that an accused must be tried in the county in which the crime was committed. Tenn. Const. art. I, § 9; *see also* Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statue or by these rules, offenses shall be prosecuted in the county where the offense was committed."). "'Proof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence.'" *State v. Young*, 196 S.W.3d 85, 101 (Tenn. 2006) (quoting *State v. Hutcherson*, 790 S.W.2d 532, 535 (Tenn. 1990) and citing T.C.A. § 39-11-201(e)). "Venue is a question for the jury and may be proven by circumstantial evidence." *Id*. at 101-02 (internal citations omitted). "Slight evidence" satisfies the State's burden if the evidence is uncontradicted. *State v. Bennett*, 549 S.W.2d 949, 951 (Tenn. 1977). In determining venue, the jury is entitled to draw reasonable inferences from the evidence. *Young*, 196 S.W.3d at 102. Importantly, where different elements of the same offense are committed in different counties, "the offense may be prosecuted in either county." Tenn. R. Crim. P. 18(b).

At the pretrial hearing in the current case, the trial court denied the motion for change of venue because the Defendant failed to file an affidavit that alleged facts constituting undue excitement as a result of newspaper articles about the case. The trial court stated that a

11

"motion for change of venue will only be granted upon proof by preponderance of the evidence that a fair trial cannot be conducted without a change of venue." The trial court found that the Defendant did not meet this burden. The Defendant moved for a judgment of acquittal at the end of the State's proof, but, in the motion, the Defendant did not argue improper venue. The trial court denied the motion because "[c]onsidering the evidence in the best light for the State of Tennessee, a rationale trier of fact could conclude that the [D]efendant committed the offenses as charged."

After review of the record, we determine that the State established proper venue. The victim testified that she lived in Greeneville, which is in Greene County. The victim also testified that all of the rape and incest incidents occurred at her home located in Greeneville. Further, the Defendant admitted to several of those instances, stating that the sexual relationship took place in this same residence. As a result, the evidence sufficiently established proper venue. The Defendant is not entitled to relief on this issue.

### D. Admission of Testimony from Members of the Clergy

The Defendant argues that the trial court erred and committed plain error when it admitted the testimony of two pastors, both of whom testified that the Defendant came to them and confessed his sexual relationship with the victim. The State contends, first, that the Defendant waived the issue on appeal for failure to raise it in his motion for new trial, and, second, the Defendant failed to show plain error.

In Tennessee, "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e); *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). This Court may, however, as the Defendant herein requests, consider errors affecting the substantial rights of the defendant if review is necessary to do substantial justice. Because, according to Tennessee Rule of Appellate Procedure 13(b), "[r]eview generally will extend only to those issues presented for review," we must review the issue presented by the Defendant herein pursuant to Tennessee Rule of Appellate Procedure 36(b), which states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." A court will grant relief for plain error pursuant to Rule 36(b) only when: "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake." *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (citing *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). If any of these five criteria are not met,

12

we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Id.* The party claiming plain error has the burden of persuading the appellate court. *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008).

In the present case, the State correctly points out that the Defendant did not include the issue of the admission of the testimony by clergy members in his written motion for new trial. The record reflects, however, that the Defendant presented this issue during the hearing on the motion for new trial, and the State did not object. The trial court allowed the Defendant to proceed on the issue; although, it ultimately denied the Defendant's motion for new trial, stating within its ruling that it made no error pertaining to the admission of the testimony of the two pastors. Because the Defendant orally argued this issue in the hearing on his motion for new trial and the trial court had the opportunity to hear and decide the issue, we find that the Defendant did not waive his challenge on the issue. We now turn to the Defendant's arguments on the merits.

Under Tennessee law, statements made to members of the clergy are generally considered privileged testimony under the clergy-penitent privilege, which provides:

> No minister of the gospel, priest of the Catholic Church, rector of the Episcopal Church, ordained rabbi, or regular minister of religion of any religious organization or denomination usually referred to as a church, over eighteen (18) years of age, shall be allowed or required in giving testimony as a witness in any litigation, to disclose any information communicated to that person in a confidential manner, properly entrusted to that person in that person's professional capacity, and necessary to enable that person to discharge the functions of such office according to the usual course of that person's practice or discipline, wherein such person so communicating such information about such person or another is seeking spiritual counsel and advice relative to and growing out of the information so imparted.

T.C.A. § 24-1-206(a)(1) (2009). There are, however, exceptions to this privilege; specifically, an exception to the privilege exists in child sexual abuse cases:

> The privileged quality of communication between husband and wife and between any professional person and the professional person's patient or client, and any other privileged communication, except that between attorney and client, as such communication relates both to the competency of the witness and to the exclusion of confidential communications, shall not apply to any situation involving known or suspected child sexual abuse and shall not

13

constitute grounds for failure to report as required by this part, failure to cooperate with the department in its activities pursuant to this part, or failure to give evidence in any judicial proceeding relating to child sexual abuse.

T.C.A. § 37-1-614 (2010). At Tennessee Code Annotated section 37-1-602(a)(3), child sexual abuse is defined extensively. There are essentially four definitions for the term, addressing four different situations. The first two definitions clearly limit the lifting of the privilege to incidents occurring before the victim is thirteen years old and specifically reference the criminal offenses commonly charged in such a situation. T.C.A. § 37-1-602(a)(3)(A) & (B) (2010). The third definition describes various conduct which would be considered by the average layperson to be child sexual abuse without reference to the criminal code. T.C.A. § 37-1-602(a)(3)(C) (2010). The fourth definition states:

> For the purposes of the reporting, investigation, and treatment provisions of §§ 37-1-603[,] 37-1-615 "child sexual abuse" also means the commission of any act specified in subdivisions (a)(2)(A)-(C) against a child thirteen (13) years of age through seventeen (17) years of age if such act is committed against the child by a parent, guardian, relative, person residing in the child's home, or other person responsible for the care and custody of the child . . . .

T.C.A. § 37-1-602(a)(3)(D) (2010). Further, a number of decisions in this state have held that Tennessee Code Annotated section 37-1-614 lifts the clergy-penitent privilege in cases involving otherwise privileged statements given to official investigations of child abuse allegations. *See State v. Smith*, 933 S.W.2d 450 (Tenn. 1996); *State v. Chesley Randall Thompson*, No. 03C01-9807-CC-00238, 1999 WL 160961 (Tenn. Crim. App., at Knoxville, Mar. 24, 1999), *perm. app. denied* (Tenn. Sept. 13, 1999); *State v. Reuben Carlton Bowen, Jr.*, No. 03C01-9108-CR-241, 1992 WL 13908 (Tenn. Crim. App., at Knoxville, Jan. 30, 1992).

In this case, the charges against the Defendant include several counts of rape of a child and incest, occurring between October 2006 and December 2008. The Defendant admitted his sexual relationship with the victim, specifying no period of time in which the sexual relationship with the victim occurred. The Defendant admitted his sexual relationship with the victim to Fox, stating that he and the victim "had [a] sexual relationship for about a three month period" in 2008. The Defendant included no other details regarding the time frame of the sexual abuse in his statements to Fox. Here, because the Defendant was the victim's stepfather and was, for purposes herein, considered the victim's parent, one of the four definitions of "child sexual abuse" applies to this case; therefore, an exception to the privilege exists. Because the Defendant acted as the victim's parent and resided in the home with the victim, the fourth definition of "child sexual abuse" as defined in Tennessee Code

Annotated section 37-1-602(a)(3)(D) applied. As a result, the ruling of the trial court is presumptively correct, and the Defendant is not entitled to relief on this issue.

## E. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence to convict him of rape of a child and incest. Specifically, the Defendant asserts that the victim's testimony had been "tainted" as to "specific dates, times, and locations of the alleged offenses." The Defendant contends that "the more people the victim spoke with after December 12, 2008, the more sexual encounters she all of a sudden began to remember that allegedly occurred between herself and the [Defendant] . . . ."

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant challenges the evidence supporting his rape of a child and incest convictions. A conviction for rape of a child requires "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2010). Tennessee Code Annotated section 39-13-501(6) and (7) defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . ." and sexual contact as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . ." A conviction for incest requires proof that (1) the defendant engaged in sexual penetration with the victim as defined by Tennessee Code Annotated section 39-13-501(7); (2) the defendant knew that the victim was his or her natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, or adoptive child; and (3) the defendant acted intentionally, knowingly, or recklessly. *See* T.C.A. §§ 39-15-302(a)(1) (2010); 39-11-301(c) (2010).

The evidence, considered in the light most favorable to the State, proves that the Defendant had a sexual relationship with the victim. The victim testified to the circumstances of each rape. The first count of rape of a child took place in October 2006, when the victim was twelve years old, after the victim moved to a new school in Greene County. The victim testified that she "got off the bus from school . . . and [she] walked in the house and then [the Defendant] talked [her] into going into [his] bedroom and he shut and locked the door behind [them] and then he took [her] clothes off and his clothes off and then

16

he stuck his penis in [her] vagina."

The victim testified to the second count of rape, which took place in December 2006 around the Christmas holiday. The victim testified that the Defendant told the victim to go to his bedroom shortly after she woke up. He shut and locked the door and "started taking [her] clothes off and then stuck his hands in [her] vagina and fingered [her]."

The third count of rape concerned the penetration that took place around the time of her sister's February 13, 2007, birthday. She testified that the Defendant again took the victim into his bedroom and "stuck his penis in [her] vagina." The victim testified that she was "upset and mad[,]" but the Defendant threatened to hit her if she told anyone.

The fourth count of child rape took place on her brother's birthday, July 22, 2007. After her brother's birthday party, the Defendant again took the victim into his bedroom and locked the door. The victim testified that the Defendant "started taking both of our clothes off and stuck his penis in [her] vagina."

The fifth count of rape took place in August 2007, while the victim was still twelve, after the family had gone shopping for school supplies at Wal-Mart. The Defendant "talked [the victim] into [the bedroom]" by asking her to help him clean the bedroom. The victim testified that "[he] shut the door and locked it behind us and then he started taking both of our clothes off . . . and then stuck his penis in [her] vagina."

The first count of incest took place around the end of the school year in May 2008, when the victim was thirteen. The victim testified that she got off the bus after school and went to her bedroom. The Defendant entered her bedroom and told her to go to his bedroom where he again "took both of [their] clothes off and then stuck his penis in [her] vagina." The victim testified to digital penetration and oral sex in addition to the penile penetration on this occasion. The victim testified that the Defendant had been her stepfather for approximately ten years.

The seventh count, also for incest, involved penile penetration in December 2008, when the victim was fourteen. The victim testified that the Defendant talked her into the bedroom, where he closed and locked the door. He then took her clothes off and his clothes off, and "he stuck his penis in [her] vagina." This rape prompted the victim to tell her school bus driver about the abuse.

The Tennessee Supreme Court has held that a child rape victim's testimony can provide sufficient evidence to support rape of a child convictions. *State v. Elkins*, 102 S.W.3d 578 (Tenn. 2003). The victim testified to the sexual penetrations by the Defendant,

17

giving dates and details of each; the Defendant admitted to several instances of sexual penetration of the victim; and Dr. Reardon, a gynecologist, testified that his examination of the victim's vagina indicated that the victim had regular sexual intercourse. Accordingly, the evidence was sufficient to support the jury's finding beyond a reasonable doubt that the Defendant committed rape of a child and incest.

Further, to address the Defendant's contention that the victim's testimony is unreliable because "the more people the victim spoke with after December 12, 2008, the more sexual encounters she all of a sudden began to remember . . .[,]" Tennessee courts have repeatedly held that questions concerning the credibility of witnesses are resolved by the trier of fact. *See Bland*, 958 S.W.2d at 659; *Liakas*, 286 S.W.2d at 859. Therefore, credibility determinations are made by the jury, and the jury in this case, as demonstrated through their verdict, found the victim credible. The Defendant is not entitled to relief on this issue.

### F. Motion for Mistrial

The Defendant claims that the trial court abused its discretion when it denied his motion for a mistrial, which he made after DCS Investigator Barnes testified that the victim reported that her first sexual contact with the Defendant occurred when she was five years old.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a mistrial must be declared. *Id.* Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). The defendant bears the burden of establishing a manifest necessity. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This Court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

We conclude the Defendant has not shown a clear abuse of discretion on the part of the trial court. Barnes's comment was made in response to defense counsel's question on cross-examination, which concerned whether the victim's reports of the rapes at issue were a complete statement of the victim's accusations. Barnes testified that the victim "told her that things had been going on with her since she was five." Barnes made the statement in direct response to a question posed by defense counsel. Although Barnes's statement was

improper, defense counsel asked the question on the issue, and the answer was a foreseeable response to the question. Additionally, the trial court gave a specific curative instruction to the jury, explaining that the jury must disregard the statement and consider only evidence related to incidents occurring in October 2006 and thereafter. We presume jurors follow the curative instructions of the trial court. *State v. Stout*, 46 S.W.3d 689, 715 (Tenn. 2001); *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). The testimony does not, therefore, demonstrate a manifest necessity requiring a mistrial. The Defendant is not entitled to relief on this issue.

### G. Prosecutorial Misconduct

Lastly, the Defendant contends that the trial court erred when it denied the Defendant's motion for new trial based on the prosecutor's alleged misconduct. He asserts that the prosecutor committed misconduct when he mentioned the Defendant's travel to Moldova in his opening statement, direct examination of Lieutenant Ellison, and in his closing argument. The State responds, first, that the Defendant waived the issue by failing to object at the time of the comment by the State's witness at trial. The State also argues that the Defendant failed to object when the prosecutor mentioned the Defendant's travel to Moldova during his opening and closing statements. The State argues, in the alternative, that the statements did not prejudice the Defendant. Thus, the State contends that the trial court did not abuse its discretion when it denied the Defendant's motion for new trial on this issue because the prosecutor did not commit prosecutorial misconduct by restating the evidence presented.

The State is correct that the Defendant risked waiving review of this issue by failing to contemporaneously object to the statements. *See* Tenn. R. App. P. 36(a); *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997). The Defendant challenges statements made by the State in the its opening statement, its questioning of Lieutenant Ellison on direct examination, and its closing argument; however, the Defendant only objected one time, during the direct examination. Typically when a prosecutor's statement is not the subject of a contemporaneous objection, the issue is waived. Tenn. R. Crim. P. 33 and 36(a); *State v. Thompson*, 10 S.W.3d 299, 234 (Tenn. Crim. App. 1999); *State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Nonetheless, we will address the merits of the Defendant's claim.

We have recognized five general areas of prosecutorial misconduct: (1) intentionally misstating the evidence or misleading of the jury on the inferences it can draw; (2) expressing personal beliefs or opinions; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) adding outside issues to the guilt or innocence issue; and (5) arguing or referring to outside facts. *State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003). Of

course, if the court took curative measures, such as proper jury instructions, such measures will likely render the misconduct harmless. *State v. Chico McCracken*, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082, at *8 (Tenn. Crim. App., at Jackson, Mar. 24, 2003), *perm. app. denied* (Tenn. Sept. 2, 2003).

Further, when a prosecutor has engaged in improper conduct, the test for determining whether there is reversible error is "whether the impropriety 'affected the verdict to the prejudice of the defendant.'" *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994) (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). In making this determination, we consider the following: (1) the conduct complained of in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. *State v. Chalmers*, 28 S.W.3d 913, 917 (Tenn. 2000).

The specific comment made at opening argument that the Defendant complains about is as follows: "Ladies and gentlemen of the jury, this Defendant after talking to the detectives and after talking to law enforcement went to a foreign country, went to Moldova or something else, some country near Russia." On direct examination of Lieutenant Ellison, the following occurred:

QUESTION        Now at some point did you learn that the [D]efendant, Jeremy Workman, had left the country?

ANSWER          Yes. I received a call on January 22nd from a Paul Sanchez. He is a federal law enforcement officer with the State Diplomatic Service in the country of Moldova. He was inquiring about - - -

[DEFENSE COUNSEL]     Objection to hearsay.

THE COURT       Sustained.

The comment made at closing argument by the prosecutor is as follows: "[The Defendant] told Jim Ellison and Susan Barnes he wasn't leaving, he'd stick around. He went to Moldova."

Thus, before the Defendant's hearsay objection, Lieutenant Ellison testified on direct examination that he found out from a federal agent that the Defendant had traveled to Moldova. After Lieutenant Ellison testified to his knowledge of the Defendant's

20

whereabouts, Defense counsel objected but seemingly limited his objection to the statements made by the federal agent and not Lieutenant Ellison's other testimony. Defense counsel neither requested a curative instruction nor objected to comments by the State in its opening statement or closing arguments regarding the Defendant's travel to Moldova. Therefore, the evidence in the case showed that the Defendant left the country during the investigation into his sexual conduct with the victim. Although the trial court sustained the Defendant's hearsay objection to the discussion between the federal officer and Ellison, the fact remains that, to Ellison's knowledge, the Defendant left the country. The Defendant did not explore Ellison's knowledge of that fact in trial. Therefore, the State restated the evidence in its opening and closing arguments when it mentioned that the Defendant had left the country during the investigation. As a result, the statements were not improper.

Even if the statements were improper, the prosecutor's conduct did not improperly prejudice the Defendant. Although the Defendant objected to Ellison's recounting his conversation with the federal law enforcement officer as hearsay during the prosecutor's direct examination of Ellison, he did not contemporaneously object to the State's reference to Moldova in the prosecutor's opening and closing arguments. Further, the Defendant failed to ask for a curative instruction when he did object. Additionally, the cumulative effect of any improper argument and any other errors in the record were far outweighed by the strength of the evidence supporting the jury's finding of the Defendant's guilt beyond a reasonable doubt. Accordingly, we hold that the trial court did not err in denying the Defendant's motion for new trial on this issue. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE